# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT HAMILL, | ) Civil Division |
|       Plaintiff, | ) No. 2:21-cv-717 |
| v. | ) |
| FRANK RUSSELL COMPANY D/B/A RUSSELL INVESTMENTS GROUP, LLC | ) **JURY TRIAL DEMANDED** |
|       Defendant. | ) |

## COMPLAINT

AND NOW COMES Plaintiff, Scott Hamill , ("Plaintiff" or "Mr. Hamill"), by and through his undersigned counsel, and brings this Complaint seeking legal and equitable relief for disability and age discrimination against Defendant Frank Russell Company d/b/a Russell Investments Group, LLC ("Defendant," "Russell," or the "Company") in violation of the Americans with Disabilities Act of 1990 ("ADA") and the ADA Amendments Act of 2008 ("ADAAA"), the Age Discrimination in Employment Act 29 U.S.C. § 621, et seq. ("ADEA"), as well as pendent state law claims arising under the provisions of the laws of this Commonwealth, to wit, the Pennsylvania Human Relations Act, 42 P.S. § 951, et seq. (hereinafter referred to as "PHRA"). Mr. Hamill states and avers the following:

## JURISDICTION AND VENUE

1. Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331, 1332 and 1391. This action is authorized and instituted pursuant to the ADA, ADAAA, the ADEA and the PHRA.

2. Pursuant to 28 U.S.C. § 1367(a), The United States District Court for the Western District of Pennsylvania has supplemental jurisdiction over Mr. Hamill's state-law claims, which

arise from the case and/or controversy as the aforementioned claims, for which this Court has original jurisdiction.

3. The unlawful employment practices and wrongful termination were committed by the Defendant in or around Allegheny and/or Butler County, Pennsylvania. Therefore, the United States District Court for the Western District of Pennsylvania is the proper venue for the action under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §1391(b).

4. Plaintiff timely exhausted his administrative remedies by filing a charge against Defendant on or about December 4, 2020 jointly with the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC") at 533-2021-00392. Plaintiff's PHRC and EEOC Charges are incorporated by reference as if fully set forth herein. On March 12, 2021, the EEOC mailed Plaintiff a Dismissal and Notice of Rights letter (the "Right to Sue" letter), advising him of the right to bring this action. Plaintiff has filed the instant suit within 90 days of receipt of the Right to Sue letter.

5. At all relevant times hereto, Russell was an employer within the meaning of the ADA, ADAAA and PHRA.

## PARTIES

6. Scott Hamill is a 62-year-old male individual who resides at 106 Ridgemont Drive, Cranberry Township, Pennsylvania 16066.

7. At all relevant times hereto, Russell is and was a Washington for-profit corporation with a principal office located at 1301 Second Avenue, Suite 1800, Seattle, WA 98101.

## FACTS

8. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

9. Mr. Hamill worked for Russell for just shy of seventeen (17) years.

10. Mr. Hamill was the Divisional Director of the Eastern United States up until his firing, which took place on September 22, 2020.

11. Mr. Hamill was sixty-one (61) years of age at the time he was terminated.

12. At all times relevant herein, Mr. Hamill suffered from non-small cell lung cancer (subtype - adenocarcinoma)—having been diagnosed in 2012.

13. Mr. Hamill's cancer was well-known within Russell.

14. In the beginning, Russell was sympathetic to Mr. Hamill, allowing him to take time off if needed, until after he returned from taking leave under the Family Medical Leave Act ("FMLA") in October of 2019, at which point Mr. Hamill became sicker, and Russell grew less understanding.

15. In April of 2020, Mr. Hamill's physicians identified a Squamish cell tumor in Mr. Hamill's lung, which caused him to require a more aggressive form of treatment.

16. Mr. Hamill discussed his new diagnosis with his supervisor, Brad Jung (Head of North America).

17. Formerly, Mr. Hamill required a daily chemo pill combined with three (3)-hour chemo fusion every three (3) weeks.

18. Due to his new diagnosis, Mr. Hamill now required daily radiation (for 25 sessions) plus an additional seven (7) weekly chemo treatments.

19. Significantly, during Mr. Hamill's discussion with Mr. Jung wherein he informed him of his new diagnosis, Mr. Jung asked Mr. Hamill about his plans for his retirement.

20. Mr. Hamill expressed that he desired to keep working and that he would take his entitled sabbatical before he planned to retire.

21. Mr. Hamill also advised Mr. Jung that he did not wish to take FMLA, and that he believed he could perform the essential functions of his job as he underwent his treatment.

22. Mr. Hamill continued to work and did not miss a day during this period.

23. While he lost a significant amount of weight and appeared ill throughout July and into August, he was able to perform his job satisfactorily and did not receive any discipline or so much as a verbal correction during this time frame.

24. In fact, throughout the course of Mr. Hamill's employment with Russell, Mr. Hamill completed all job functions, roles, and responsibilities in at least a satisfactory manner, often exceeding expectations and receiving glowing performance evaluations.

25. He has no history of discipline in his personnel file and never received even a verbal reprimand.

26. In early August, Rob Ouimet (an employee supervised by Mr. Hamill) submitted to him an Event Tracking Form ("ETF"), which was approved by Mr. Hamill.

27. Approving projected expenses for those individuals that he supervised (such as Mr. Ouimet) was part of Mr. Hamill's ordinary job duties.

28. As a global investment company, Russell is subject to the Financial Industry Regulatory Authority ("FINRA").

29. FINRA writes and enforces the rules governing registered brokers and broker-dealer firms in the United States.

30. FINRA Rule 3220 "Influencing or Rewarding Employees of Others" (hereinafter the FINRA "Gift Rule") sets forth certain regulations relating to gifts or the giving of anything of value by a FINRA member (such as Russell).

31. Mr. Hamill would be responsible for reviewing and approving the ETF in accordance with this and other FINRA Rules, including Rules 2310, 2320, 2341 and 5110 relating to Business Entertainment and Non-Cash Compensation.

32. The ETF was for a charity golf event, scheduled to take place in Sebring, Florida (hereinafter, the "Event").

33. The contribution amount listed was $1,000 and the listed "Expenses to be Covered" was detailed by Mr. Ouimet as "**Food and Beverage.**"

34. Significantly, food and beverage are permitted business entertainment expenses and/or donations under FINRA's rules. As such, Mr. Hamill approved the ETF.

35. Mr. Ouimet attended the Event and uploaded his receipt (that was supposed to be for food and beverage) to the Company's Concur Expense System.

36. In Concur, this receipt would go directly to Company's Expense Team, *without Mr. Hamill having the opportunity to review or reject the expense*.

37. The $997.00 receipt Mr. Ouimet uploaded was *not* for food and beverage (as approved by Mr. Hamill).

38. Rather, it was for two (2) range finders and four (4) golf bags, which were raffled off at the event.[1]

39. This was perceived by the Company to violate FINRA Gift Rule, which prohibits a member from gifting anything of value over $100.00.

---

[1]. It is common practice in the industry for several businesses to donate to golf outings like the subject Event. Donations or payments are then pooled by the Country Club or event host and applied to the event's various expenses such as food and beverage, raffle items, etc. Upon information and belief, most contributing companies to this particular Event were not companies regulated by FINRA.

40. Mr. Hamill was contacted by Vicky Pieron from Russell's Expense Team in mid- to-late August regarding Mr. Ouimet's submission.

41. Knowing nothing about the expense, Mr. Hamill indicated that he would contact Mr. Ouimet for additional details.

42. Mr. Ouimet admitted to making a mistake.

43. Mr. Hamill advised him to contact the Event Manager to see if food and beverages were served at the Event.

44. Breakfast sandwiches were, in fact, served at the Event, and the Country Club provided Mr. Ouimet with a revised receipt, reflecting that Russell's monies were applied to food and beverage, as they were initially approved to do.

45. Mr. Ouimet provided a copy of the revised receipt to Mr. Hamill.

46. Mr, Hamill then emailed the receipt to Art Hill (Compliance), asking whether the revised receipt would suffice.

47. A copy was also provided to Brad Jung, who advised Mr. Hamill to work with Art Hill and Vicki (from the expense team) to get final approval.

48. In early September 2020, Mr. Hamill was contacted by Russell's Compliance Group to explain why there were two receipts for the event.

49. Mr. Hamill explained that Mr. Ouimet had initially submitted an incorrect receipt and that he obtained a new corrected receipt to comply with FINRA's Rules.

50. Compliance then conducted an "investigation" that concluded with the decision to terminate Mr. Hamill because he failed to follow Company policy, premised upon the conclusion that the original receipt submitted by Mr. Ouimet (unbeknownst to Mr. Hamill) violated FINRA's Gift Rule.

51. Mr. Hamill maintains that his actions did <u>not</u> violate FINRA's Gift Rule.

52. Setting aside the fact that Mr. Hamill was not the individual who committed the claimed violation, the intent behind the at-issue Rule is to avoid improprieties that may arise when a member firm gives anything of value to an employee of a customer.

53. The range finders and golf bags itemized on the initial receipt submitted were not gifts preconditioned on achievement of a sales target.

54. In fact, Russell did not even know who ended up winning these gifts as part of the auction, and the gift basket did not indicate that these items were donated by Russell which may otherwise cause a potential employee of a customer to desire to do business with Russell.

55. The "investigation" into Mr. Hamill's alleged violation began as Mr. Hamill's cancer and the effects thereof visibly worsened and shortly after his immediate supervisor inquired into his plans for retirement, demonstrating that both his age and disability were motivating factors in his termination.

56. Upon information and belief, Mr. Jung was involved in the decision to terminate Mr. Hamill, along with other individuals who were aware of Mr. Hamill's disability.

57. Russell treated Mr. Hamill differently than other younger, non-disabled individuals. A nearly identical situation arose previously involving another Russell employee (who is no longer with the Company due to unrelated reasons.

58. Said individual assembled a gift basket to be raffled off at a similar event and submitted receipts for the items which she purchased amounting to $140.00, clearly in violation of FINRA regulations and received a verbal reprimand as a result of her actions.

59. Said individual's supervisor at the time (who would be akin to Mr. Hamill in this situation) did not receive any type of discipline, not even a verbal reprimand.

60. As such, this fabricated reason for Mr. Hamill's termination is nothing more than pretext to mask the discriminatory intent of Russell.

61. Russell seized upon this opportunity to get rid of a sick, older employee.

62. The County's aforementioned conduct and disparate treatment, discrimination retaliation and wrongful termination of Plaintiff based on his disability and request for reasonable accommodation were in violation of the ADA, ADAAA, ADEA and the PHRA.

63. Plaintiff is in a protected class under the ADA, ADAAA, ADEA and PHRA at the time the acts of discrimination and retaliation occurred.

64. At all relevant times hereto, Defendant acted or failed to act by and through its duly authorized agents, servants, and employees, who conducted themselves within the scope and course of their employment.

## COUNT I
## Discrimination in Violation of the Americans with Disabilities Act and Amendments ("ADA" and "ADAAA")

65. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

66. At all times relevant, Defendant was an "employer" within the meaning of the ADA and/or ADAA.

67. Plaintiff is a "qualified individual with a disability" as that term is defined in the ADA and/or ADAAA because he has, or had at all times relevant hereto, a physical impairment that substantially limited/limits one or more major life activities, or because he had a record of such impairment.

68. Plaintiff also is a "qualified individual with a disability" as that term is defined in the ADA and/or ADAAA because he was regarded as and/or perceived by Defendant and their

agents as having a physical and/or mental impairment that substantially limited/limits one or more major life activities.

69. Plaintiff could complete the functions of his position as a Divisional Director with or without a reasonable accommodation.

70. Defendant terminated Plaintiff over a claimed violation of FINRA regulations.

71. Plaintiff maintains that his conduct did not violate FINRA regulations.

72. Plaintiff further maintains that other, non-disabled Russell employees committed actual violations of FINRA regulations and were not disciplined.

73. The reason proffered for Mr. Hamill's termination is pretext to mask the discriminatory intent of Russell seizing upon this opportunity to get rid of a sick employee.

74. Defendant's termination of Plaintiff's employment was motivated by his disability and/or because Defendant regarding Plaintiff as disabled.

75. Defendant's unlawful and discriminatory practices complained of herein were intentional and done with malice or without reckless indifference to Plaintiff's federally-protected rights.

76. As a direct and proximate result of the unlawful and discriminatory practices described herein, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and potential lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, and pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he has suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## COUNT II
## DISCRIMINATION, RETALIATION AND WRONGFUL DISCHARGE UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT ("ADEA")

77. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length.

78. At all times relevant in this case, Mr. Hamill has been at least 40 years of age and protected by the ADEA, 29 U.S.C. § § 621-634.

79. At all times relevant to this case, Defendant was an "employer" within the meaning of the ADEA, 29 U.S.C. §630(b).

80. Although Plaintiff at all relevant times successfully performed his job from the perspective of a reasonable person, inquiries were made regarding his retirement plans.

81. Defendant terminated Plaintiff over a claimed violation of FINRA regulations.

82. Plaintiff maintains that his conduct did not violate FINRA regulations.

83. Plaintiff further maintains that other, younger Russell employees committed actual violations of FINRA regulations and were not disciplined.

84. The reason proffered for Mr. Hamill's termination is pretext to mask the discriminatory intent of Russell seizing upon this opportunity to get rid of an older, more costly employee.

85. Defendant's termination of Plaintiff's employment was motivated by his age.

86. Based on the above-described acts, practices and omissions, Defendant engaged in unlawful discrimination under the ADEA based on Plaintiff's age.

87. Defendant's unlawful and discriminatory practices complained of herein were intentional and done with malice or without reckless indifference to Plaintiff's federally-protected rights.

88. As a direct and proximate result of the unlawful and discriminatory practices described herein, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and potential lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, and pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he has suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## COUNT III
## PHRA – DISCRIMINATION and RETALIATION

89. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein at length

90. This is an action arising under the provisions of the laws of the PHRA and this Honorable Court has, and should, exercise pendent jurisdiction over the same because the cause of action set forth in this COUNT III arises out of the same facts, events and circumstances as in the above COUNTS I AND II, and therefore judicial economy and fairness dictate that this COUNT II be brought in this same Complaint.

91. At all times relevant, Defendant was an "employer" within the meaning of Section 954(b) of the PHRA.

92. By engaging in the creation and fostering of a discriminatory environment based on Mr. Hamill's age and/or disability, Defendant violated those sections of the PHRA which prohibits discrimination based upon age and disability regarding the continuation and tenure of employment.

93. Defendant terminated Plaintiff over a claimed violation of FINRA regulations.

94. Plaintiff maintains that his conduct did not violate FINRA regulations.

95. Plaintiff further maintains that other, younger, non-disabled Russell employees committed actual violations of FINRA regulations and were not disciplined.

96. The reason proffered for Mr. Hamill's termination is pretext to mask the discriminatory intent of Russell seizing upon this opportunity to get rid of an older, disabled or perceived as disabled employee.

97. Defendant's termination of Plaintiff's employment was motivated by his age, disability and/or because Defendant regarding Plaintiff as disabled.

98. Defendant's unlawful and discriminatory practices complained of herein were intentional and done with malice or without reckless indifference to Plaintiff's state-protected rights.

99. As a direct and proximate result of the unlawful and discriminatory practices described herein, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and potential lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, and pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses he has suffered and will continue to suffer.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## **DEMAND FOR JURY**

WHEREFORE, Plaintiff demands judgment against Defendant, and damages in excess of $75,000 as follows:

a. That Plaintiff be awarded actual and consequential damages to make Plaintiff whole including back pay with prejudgment interest, front pay and compensation for lost

12

benefits, in an amount to be proven at trial, and other affirmative relief necessary to eradicate the effects of Plaintiff's damages associated with Defendant's discrimination, retaliation and wrongful termination of Plaintiff pursuant to the ADA, ADAAA, ADEA and PHRA;

b. That Plaintiff be awarded economic and compensatory damages to compensate for all costs associated with the discrimination and retaliation including lost wages and medical expenses;

c. That Plaintiff be awarded nominal damages;

d. That Plaintiff be awarded punitive damages in an amount sufficient to punish Defendant for its intentional, wanton and malicious conduct and to deter similar misconduct;

e. That Plaintiff be awarded the costs of this litigation, including reasonable attorney's fees; and

f. That Plaintiff be awarded such further relief as deemed to be just and proper.

-

Date:   June 1, 2021                              Respectfully Submitted,

*/s/ Stephanie L. Solomon*
Stephanie L. Solomon, Esquire
Pa. I.D. 208056
HKM EMPLOYMENT ATTORNEYS LLP
220 Grant Street
Suite 401
Pittsburgh, PA  15219
412.760.7802
ssolomon@hkm.com

**JURY TRIAL DEMANDED**